This morning is Petry v. Prosperity Mortgage Company. And I guess we'll hear first from Mr. Carney whenever you're ready. May it please the Court. The central issue in this appeal is whether, as a matter of Maryland state law, a finder's fee can include a fee for services. The statutory text of the Maryland Finder's Fee Act says that it must. The district court's decision, however, said that it can't. The district court's construction, in addition to being contrary to the text of the Finder's Fee Act... Well, you're going to have to start with the facts. It seems to me we either have prosperity as a broker or as a lender. If it's a lender, this case goes away. If it's a broker, they can't charge lending fees and brokering fees. But to get into an abstract chase through the various definitions of the Maryland Code ultimately end up as to whether prosperity was a lender. Well, Your Honor, the claim in this case is that prosperity was actually both a broker and a lender. Now, that's an impossibility. You can't broker a loan for yourself. Unless you're going to play double-talk with the language of the statute. The statute says a broker is one that does not include a lender. But in common language, you can't be a broker of a loan and the lender on the loan. When you solicit a loan for yourself, you don't call yourself a broker. You're the lender. And that's one of the problems in this case, I think, that your brief consistently talks about being a broker and a lender at the same time, which would involve double payment, double fees. But in this case, all the loan documents talk about a loan from prosperity to your clients, and they paid normal lending fees, and everything's referred to as a loan. And your only case comes from the notion that because they had a preexisting arrangement to sell that loan four days later, they somehow become a broker because somebody else ultimately purchased the loan. But I must say, we have to start, I think, with the facts of the case. And if those lending documents are total shams, then you're going to have to show some evidence that they are. Otherwise, we take them the way they say on their face, don't we? Well, Your Honor, the notion of a broker being a lender in the same transaction— No, stick with my actual question. My question was, don't we take the loan documents on their face, the closing documents on their face, unless there's some reason to indicate otherwise? Under the FINDERS-B Act— I'm talking about factually. We have cases start with facts, real-life transactions. In this case, the Petries borrowed money from Prosperity, according to the papers. Now, you have to argue something else, and I don't know on what facts you're going to rely that Prosperity was a broker. Your Honor, the facts that Prosperity acted as a broker in the transaction are shown by the table-funded nature of the loan. Well, it wasn't table-funded, was it? It was sold four days later? No, Your Honor. Was the table loan funded right at the table there? Yes, Your Honor. The loan was funded by Wells Fargo. Prosperity put its name on the documents as the lender. Yeah, but why isn't that legitimate? Because under the Maryland FINDERS-B Act, a table-funded loan is brokered by the originator. So in that situation, Prosperity is the broker. They're also naming themselves as the lender. Let me just—what's really intriguing to me, we get into the business of table-funded, what the documents say, and yet we sort of gloss over the fact of what Prosperity really is. It's a company that's 50 percent owned by Wachovia and Wells Fargo and Long and Foster, a broker and a lender, 50 percent owned. I'm of the—I've got to believe no matter what they charge has to be split profit-wise 50 percent. Yes, Your Honor. And I don't—I mean, this is really not coming out clear in terms of it, but I'm still trying to understand because that looks like to me fundamentally the problem. And you're talking about the borrower in terms of what the borrower is paying. So if the borrower pays $2,000, Prosperity gets it. I don't know if this is the case or not. Maybe the other side will tell me. But it would seem to me 1,000 goes to Wachovia, 1 goes to the other 50 percent partner, which would indicate that's not what Wachovia could have charged or would have charged this borrower because they only got $1,000, but that broker, Long and Foster, got another $1,000. That's what's confusing to me about this case. I mean, I know we're getting the whole business of actual fees. These are what Wachovia actually would have charged as a lender. Can't be because they can't—unless they are getting all of those fees, origination fees, application fees, all of it goes to Wachovia, none to the broker. Is that the case? I mean— Yes, Your Honor. That's probably what's upsetting here is we're dealing these legal arguments. We're getting hung into what's actual fees and why the finest fee is here. But what's happened is Long and Foster is doing something it cannot do itself. It cannot take a loan from Wachovia and do it. And Wachovia can't use a broker to do it. It can't be a broker in it. So what it does, it creates this entity that's both of them. Yes, Your Honor. And yet it comes down—that seems to be the answer to your question in terms of can it be both. I don't know if they can be both or not, but they certainly are owned by both. And they're owned solely by both. There's no other entity other than a broker and a bank in this situation. And that's it. Yes, Your Honor. It's a joint venture limited partnership or general partnership. And I don't know what they are. I don't know how to get to be a lender just because one 50 percent of the profit gave them— 50 percent of the ownership gave them the money, but the other 50 percent didn't give them anything. But they still are obligated to both. What does that mean? Does that factor into this? It does, Your Honor. This is precisely the kind of arrangement that the Finder's Fee Act was designed to prevent. And one of the specific purposes of the Finder's Fee Act was to prevent a situation where a broker acts as a lender. So in response to Judge Niemeyer's questions, the Finder's Fee Act specifically contemplates that a broker can be a lender, and it wants to stop these self-interested arrangements. And this is the whole mortgage market, even as today. The way banks get capital is they make loans, they sell the loans, and with the proceeds make further loans. The loans that are sold are securitized, and they get their money back often from the securitization of those loans. Or they just hold them in their own interest. But to suggest that the whole mortgage industry, because they have pre-existing arrangements for making loans and then selling those loans, and say that's a brokering for the back people, then you have to say they're also brokering for the public in these loans. But the documents, incidentally, I thought in this case, and I was just trying to look it up, I thought in this case it was not a table loan. Petrie made the loan, and I think the loan was sold four days later, wasn't it, too, Markopia? Your Honor, the loan was table funded. That's the allegation. No, I don't want to use the term. I said when was it sold? It was, in fact, sold before the loan was closed. The thing is that the arrangement between Prosperity and Wells Fargo. I understand the arrangement. Every loan I've made on my house, they tell me it's going to be sold. I know it's going to be sold. Everybody who goes to a savings and loan makes a loan, and the savings and loan sells the loan. The question I had to use factually is when was the Petrie loan sold to Wells Fargo? The Petrie loan was sold to Wells Fargo contemporaneous with closing at the moment that the loan closed. And this is not challenging every mortgage transaction in the country. This is specifically challenging the table funded. The Petrie's loan. The Petrie's loan, the loan based on the arrangement between Prosperity and Wells Fargo and Long & Foster. Explain this term sold. I mean, I understand that's what happened, sold. But the money came from Wells Fargo. Yes, Your Honor. To Prosperity. They didn't turn around, close it, and sell it to them back. I don't get it. I mean, maybe I'm missing something here. I know it may be legal in terms of technicalities here, but I'm trying to understand what's actually happening here. Is a broker and a lender have gotten together, created an entity to do these things, and now fees arise. Of course, now the contention is the cost-benefit analysis, which you take the cost-benefit analysis, if the borrower makes out better in that transaction, the question is does the fund-to-fee act apply? In other words, if the borrower comes out of this and all the evidence shows he's better off, even in this arrangement, even if you do take money or whatever in it, then would it be otherwise because these are actual fees? That's the question, isn't it? Well, Your Honor, the question under the Finder's Fee Act is whether the relationship exists because the Maryland legislature determined that the arrangement itself was bound to create additional fees. Those fees may be harder to prove. It may infect the entire marketplace. Hold on. Let's start with this line. The Petries went to Prosperity. Prosperity proposed. And longed for their office. Yeah, but they set up a loan with Prosperity. Prosperity dealt with it. They have an office. They have capital. They have a line of credit. They made the loan. The note is payable to Prosperity. There was not even a mention of Wells Fargo in any of those documents. And I don't know. You know, I keep coming to bat with you here, but I'm looking here at the affidavit that says that the loan closed on October 21, and it was funded by Prosperity and was closed in Prosperity's name. Wells Fargo purchased plaintiff's loan from Prosperity on the secondary market on October 25, four days later. And now, is there some document to indicate otherwise? Well, there's testimony. There are the top executives of Prosperity and Long & Foster testified that all Prosperity loans are table funded. Wes Foster and Mike McDonough. Look, the table funded is a term of art, and it usually means that simultaneously at the transaction the funding is given to the bank, and the bank gives it. But that did not occur in this case. It was a clean, untable funded loan, and the money was advanced by Prosperity. They were the only entity that was present at the table. They provided the money, and they sold it four days later to Wells Fargo. Well, Your Honor, first of all, the district court found that there was a dispute of material fact about this, that this is a question for the jury. What's the fact other than Prosperity was a loan on the loan paper? The loan papers have disclosures that say who's the lender, what the lending fees are, and as a matter of fact, the testimony in this case, the lending fees were at market or below $1,200 closing fees for the lender, and that included appraisal, credit report, all done by the lender. And then the lender, with a preexisting arrangement, sold it to Wells Fargo four days later. That's what the paper trail says. Now, if you're going to come in and say the papers are all shams and they're fraud, that's a heavy thing to say. Well, Your Honor, the defendants have presented some evidence that they say suggests that. We've presented some evidence that suggests that that is not the case. This is the issue that was— That is not the case. Number one, that the loans were table funded. Don't use that word, please. Tell me what the transaction is. Your Honor, that the loans were closed in the name of Prosperity but funded by Wells Fargo. Of course they were funded by Wells Fargo, ultimately, but Prosperity drew on the line of credit. That's undisputed, which they had. But, Your Honor, the money came directly from Wells Fargo. It didn't even pass through Prosperity. It came directly to the closing table from Wells Fargo. Because the documents show the loan was made and the note paid to Prosperity. The note's payable to Prosperity, right? The note— And the deed of trust is Prosperity. Yes, but they both refer to Wells Fargo as being the place for contacts, for correspondents to be sent. Is there any indication that the loan, that the so-called selling of this loan back to Wachovia, or to Wachovia, could have been done to anybody else? In other words, could they have sold this to Bank of America? No, Your Honor. I mean, it's wealth. As Judge Lemire says, this is line of credit. But is money actually being divided by Wells Fargo? Yes, Your Honor. And if they turn around on the secondary market and sell it to another company, can they do that? Prosperity can't. So they can't do it. So what matters if it's 10 days or 20 days, it's going to Wachovia? Yes, Your Honor. It doesn't matter if you do it at that table or not. And if you decide to delay it, if you want to keep it from becoming table-funded, and you already know I'm going to get it, then you just say, don't give it to me until four days later. That's correct. And I'm not table-funded and will be outside it. Because if you give it back to me today, good. But guess what? You can't sell it to anybody else but me. Is that the case? That's the case, Your Honor. And, in fact, the people who executed the documents to transfer the loan on paper from Prosperity to Wells Fargo were Wells Fargo employees at a Wells Fargo campus. So there was no chance for anybody other than them. Why wouldn't there be? They're 50 percent of the owners of the company. That's correct, Your Honor. Along with Long and Foster. You said they were right along with Foster's office. Chief Executive Office is right there in the line of chain with Long and Foster. I mean, essentially, you've got a bank and a lender sitting right there, and another entity is created. That's correct, Your Honor. And the idea that they would be able to inoculate themselves from liability either by waiting to sell the loan or by Prosperity simply naming itself as a lender. I don't think it gets to where we are today because we could get into this. That troubles me, but I don't think that's before us. I think what we're dealing with here is a question of so what if it's that, if, in fact, the borrowers did not work home, so to speak. They didn't pay anything other than what they regularly would pay. Let me follow up on that. It seems like the act is directed towards finder's fees. Yes, Your Honor. Proposed by the broker, paid by the borrower. In this record, what are those fees? The fees are shown in the 800 series on the HUD-1, and those are all fees paid to Prosperity. They can be paid by or on behalf of the borrower, and the Finder's Fee Act says that those fees… Well, let's look at the fees in particular. Application fee was $410. That included $350 appraisal and a credit report of $2,940. Then there was a processing fee of $490, and then there was an underwriting fee of $390. Total $1,290. That's all that was paid to Prosperity. Well, and there was, I believe there was a fee paid to Wells Fargo Real Estate Tax Service as well. I'm talking about Prosperity. Yes, Your Honor. Yes, Your Honor. Now, those are all three lending fees that are legitimate lending fees, and that's all that was paid to the borrowers paid to Prosperity. And the Finder's Fee Act classifies as finder's fees all fees paid to the broker for the broker's services. Doesn't the Act, in fact, classify them as in addition to finder's fees? No, Your Honor. A finder's fee is defined as all fees that are charged for the broker's services, paid for the broker's services in procuring, arranging, or otherwise assisting a borrower in obtaining a loan. But then you get to 804. Yes, Your Honor. It says in addition to a finder's fee, a mortgage broker may charge a borrower for the actual cost of, and then there's a list of fees very similar to the fees that Judge Niemeyer just described. Yes, Your Honor. And those are the only fees that are carved out of the definition of a finder's fee. So what is the finder's fee? The finder's fee are all of those fees. And this is something that the district court found. I've got them listed right here. I'm looking at the HUD document, the settlement closing sheet. All of the fees outside of the fee paid for the appraisal, for the credit report, for the actual costs, those are the finder's fees. So this is where I'm sort of missing the boat on this, and maybe I'm seeing too much in this. I can understand the $410. $350 went to the appraisal, and the other went to the credit report. The 390 in underwriting fees and the 490 in processing fees goes to prosperity. Prosperity is not an entity that's just out there by itself and goes off. That money ultimately is newest to the benefit of the lender and the broker that owns it. Yes, Your Honor. And it would be my, I don't know, unless you're giving it to someone else, one half is going to Wachovia, the other half is going to Long and Foster since it's 50-50, and maybe the administrative costs are taken out for whatever you do here. But it would seem to me if that's the instance, then in essence, if this borrower had gone directly to Wachovia, it has to be lower than what is coming from prosperity because part of it has to go to the broker, unless the broker is just in this for the fund. I mean, there's got to be some profit coming to this broker over there. Well, it's the nature of a middleman that it's, in general, going to increase fees, and that's the reason that the legislature did not require excessive or redundant fees. It just required the relationship to exist to show that no finder's fee, that no broker's fee could be collected. That's my point. If you look at, if prosperity truly was a third party, wasn't owned by either one of these, I'm probably much more comfortable in dealing with this. But it's not, you can't look at it like that. That's not what it is. It's wholly owned by those two entities. And it's got one fee, the 410, you've already designated where it's going, and that may be something, you may not even pay all that out. I don't know, but I'll give the 410 its due. But the rest of it is part of the company and the profit it makes, and then it's split between those entities that's buying this loan for the borrower that's going on here. That's what I'm having some difficulty understanding. What's the actual fees here? What's an underwriting fee? An underwriting fee, in general parlance, would be a fee charged for underwriting the loan. That means collecting all the data about whether they're creditworthy, having them fill out the applications, reviewing the data, whether they earn enough money, that type of thing, right? I believe things like that would be included. And that's what prosperity did in this case for the underwriting fee, didn't it? Well, there's a dispute about that. The underwriting was conducted by Wells Fargo. Hold it just a minute. They sat there before an employee of Prosperity and gave all this information, and the underwriting fee was a below-market amount of $390 to underwrite the loan. Now, why isn't that just totally an underwriting fee? Well, Your Honor, however it's classified, it's still a finder's fee. Why do you have to argue against that? It seems to me, so yes, it's a fee to Prosperity, but the problem is Prosperity is not by itself just an entity out there. You can look at it as though it's some third party that have an interest, but then the money and the profit from that, then necessarily it news to the benefit of the lender and the broker there. Yes, Your Honor, and in fact it doesn't get sent to Prosperity in the first instance. The loans are net funded, so if you have a $100,000 loan and Prosperity gets $5,000 in fees, Wells Fargo only sends $95,000 to the closing table. That $5,000 Wells Fargo keeps. That's where I'm getting with this thing here. That doesn't seem to be coming out on this is yes, they are all reasonable fees that they charge to Prosperity, but it does not go to Prosperity because it doesn't own itself. It's owned by the very entities that we're dealing with, a broker and a lender who cannot do this directly with themselves, so they create this company to do something they can't do directly. Yes, Your Honor. Okay, why don't we hear from Mr. Friedel. Ms. Friedel. Friedel. Friedel. Friedel. May it please the court, I'm Irene Friedel, and I'm speaking on behalf of all the appellants today. You're going to help me and clean me up on this because I'm not understanding that relationship very well. Your Honor, the Minter case, which you'll hear about in about an hour, 40 minutes, was addressed to Prosperity's structure. Is that a reciprocation? Yes, it's a reciprocation. We're dealing with the finder's fees. Yeah, we're dealing with finder's fees. But both the Petrie case and the Minter case were brought by the same plaintiff's counsel. They alleged that Prosperity was the product of a scheme by Wells Fargo. I'm only getting at the whole basis of it, whether there's a scheme or sham or not is ultimately what it is. I'm not saying it's a sham. It could be legit. I'm just saying what it is, it's new and to the benefit of a broker and a lender. Well, let me say first, Longford Foster is a real estate agent. It's not a mortgage broker. And Mr. Barron will speak to that. Well, it's real estate. It's not a mortgage broker. And Mr. Barron, who's speaking next, will address that. I'm using the wrong term, real estate broker. But at any rate, the Minter trial was based entirely, the plaintiffs attacked the legitimacy of Prosperity as a lender. They claimed Prosperity was a broker. It was table funding all of its loans. And after a five-week jury trial, the jury rejected the plaintiff's claims in three hours or less. So that issue has been out. It's been fully vetted. We'll get to that one. Let me get to the Finder's Fee Law. There are two questions of liability under the Finder's Fee Law. Was Prosperity a broker and did it charge a Finder's Fee? We absolutely agree with Judge Niemeyer that Prosperity was not a broker  It was identified as the lender, the creditor, in the loan documents in the note, the deed of trust, on the HUD settlement statement. And therefore, under the definition, the very clear definition under Maryland law of mortgage broker, Prosperity was a lender. It was not a mortgage broker. The definition excludes any entity from mortgage broker if it's identified as the creditor in the loan documents. Prosperity made the loan. It provided all the services to make the loan. Define what would be a broker. A broker is a matchmaker, in essence. The Connor v. Morris-Berman case from the Maryland Court of Special Appeals is directly on point. In that case, there was a mortgage broker, Mortgage Masters. There was the mortgage lender, Morris-Berman. The Mortgage Masters purported to match the borrower with Morris-Berman, the lender. Morris-Berman then made the loan. It charged lending fees, and it charged a broker fee, or Mortgage Masters charged a broker fee. I'm intrigued with this relationship. It's a broker. You go online with LendingTree, and they match you up with LendingTree. Yes, that's a matchmaker. And that's what the finder's fee is aimed at. It's aimed at fees paid to a broker for making the match. That's the intent and purpose of the finder's fee law. But in this case, the plaintiff said prosperity is not just You have to make the match here if you know, is it so that all these loans are only sold? The Wachovia money is sent to Prosperity. Are those loans only sold back to Wachovia? No. The loans are sold to a number of investors. A number of folks. And that was an issue in the Minter trial. Prosperity made the loans with its own money. It got them from a line of credit from Wells Fargo, but there was nothing fraudulent about the line of credit. That was vetted in the Minter trial for five weeks. Prosperity is a lender. It didn't act as a broker in this case. So it matters not that Wachovia owns 50% of it. It does not matter. And I appreciate your comment. It's not relevant. Prosperity is a legitimate joint venture. There are many in the industry. I'm trying to figure out how I can do something like this. Because it really is interesting to me. You don't know whether they make money yet. Oh, I'm sure businesses have set up something to make money. That much I believe. There are many joint ventures like this. And so the profits that derive from Prosperity, are they then split, I assume, because it's a 50-50? Ultimately, the joint venture profits and the owners receive the profits. And the profits that would flow from this would be from these fees. Is that right? Well, the fees would go into the profit, but they also pay for Prosperity's 300 employees and all the services it provides. I mean, there's obviously a lot of costs. But, again, Prosperity has a profit, assumed. Otherwise, you would get rid of it. So that profit then goes to the two owners. Yes. So it sort of is, I don't want to, it's not kickback. I understand that. But it's something that goes back to a walk over you for having set up this nice arrangement. It's like any joint venture. The owners receive the profits from the joint venture. And in this case, these types of joint ventures are common in the lending industry because the idea is one-stop shopping. Somebody needs to buy a house, they go to Long and Foster. They find their house, Prosperity. They're not required to use Prosperity, but a home purchaser can use Prosperity. In this case, there was undisputed evidence that Prosperity's loan prices were competitive. Prosperity competed with Wells Fargo. That's a cost-benefit analysis. That's what I was getting at. Is that the issue of the case is forget it. I mean, forget whatever it is. If the bottom line is the borrower is in the same position as being anybody else, is that the whole gist of where we are on this? Because that takes care of all of my other problems. It doesn't matter. So what? The plaintiffs brought this case saying if they'd only gone to Wells Fargo, they would have gotten a better loan, a better price. So we took all of Prosperity's loan data. We gave it to the plaintiffs. By definition, it seems to be true. It seems to be true by definition because you just told me part of the profits go to Long and Foster. An entity that exists in which it sends part of its profits to Long and Foster necessarily decreases the amount that Wachovia gets. And therefore, the amount Wachovia gets, that you would think if you went directly to them, then you would get that. We determined conclusively that Prosperity did not charge more than Wells Fargo. They competed on the open market. Yeah, but you can negotiate these things. I mean, I've done hundreds of closings. I know those fees there. They're not as locked as they seem. You're not negotiating anything with Prosperity. Once they charge that $400-some-odd or whatever that processing fee is, you're not negotiating. Wells Fargo, if you go directly, you might be able to negotiate. With respect, Your Honor, Prosperity is out there competing in the marketplace trying to get loans, and these people, the Petries, got a great deal. They paid just over half a percent. I understand. I'm not disagreeing with you, I don't think, but I am trying to understand the statement that you couldn't get a better deal from Wachovia when by, and I'm going back to the economic analysis of this because that's the bottom line. Is he better off that an entity that's in the middle that makes a profit and then it splits that profit between Wachovia and Long, and Wachovia does not, in fact, get what it would have gotten, what it would have paid. If all of this had been sent to Wachovia, fine, yes. That's the same thing you'd go to go to Wachovia. But if, in fact, Wachovia, who's lent this money over to a line of credit, now getting it back through the selling of it, is the fee they get is actually less, it would seem intuitively to borrow. Had you gone directly here, you could have skipped this middle band and, and, and, well, that's what the plaintiff alleged. And it turned out not to be true. The evidence showed the prosperity of loan prices were as low as a matter of fact, I'm not talking about what they allege. I'm saying as a fact, you're saying as a matter of fact, Fargo's loan was more expensive. Well, as well, can I be analyzed? Can I be based upon this? Because they are not getting that fee. They are getting something much less. I'm talking about a fact. I don't understand what they're alleging. No, I'm talking about fact. From an economic analysis, they have to get less. It is not the case. It really is fact. We hired, retained an expert, Marcia Corshane. She analyzed all the pricing data, the actual pricing data, loans that borrowers got from prosperity, and she compared it to data from Wells Fargo. This was tons of pricing data. We didn't know how it was going to come out. We didn't think that borrowers paid more at prosperity. It turned out they don't. Prosperity charged fees commensurate with the correspondent letter that was competitive in the marketplace. So the Petrie's did, in fact, based on the analysis of the data, get a good deal at just over half a percent of the total amount. That may be the answer to our question, right? If it's no difference, the finder's fee doesn't kick in. But is that something that's clear under Maryland law? Well, under Maryland, getting back to what a finder's fee is under Maryland law, the plaintiffs, they conceded that they had no evidence that prosperity charged any fee that wasn't for the lending services. Prosperity was the only lender here. Wells Fargo was not charging duplicative fees to the borrower, only prosperity charge fees. The question is, and this goes back to the Connor case, what fee did prosperity charge that was a broker fee or a finder's fee? Prosperity is entitled to compensation as a lender. That's clear under Maryland law. That's clear under the Connor case. So what did prosperity charge that wasn't for the services as a lender? And the plaintiffs stood before the court and said they didn't have And that's the crux of the case. I do agree with Judge Neumeier, though, that we don't even need to get to this question because prosperity was not a broker under the statute. It didn't fall within the definition of broker, and the case should have been dismissed at the motion to dismiss stage. What percentage of prosperity's loans went to Wells Fargo? At times, up to 90%, but there was variability in that. What was the mechanism for going somewhere other than Wells Fargo? That gets into the second. There's a secondary market group that analyzes which loans should go where. But in terms of the choice from borrowers, what? The borrower doesn't. This is all on the secondary market, so the borrower gets a loan from prosperity. It's like if you get a loan from SunTrust or any other entity, often these lenders sell their loans on the secondary market. That's one of the frustrating things about being a borrower. You get a mortgage, and then you find out you're making your payments elsewhere. That's a common. That's just the reality of the secondary mortgage market. What percentage of Long and Forster's clients went to prosperity? That's a question I'm afraid my co-counsel, Mr. Varen, will have to answer, but it was in the range of, I want to say, 30, 20 to 30%. What was the decision mechanism for the borrower to go there as opposed to somewhere else? The borrowers shop. They shop around. We know in this case and in the Minter case, the borrowers testified that they looked for the best price they could get. They saw what the options were on the marketplace. They were absolutely not required to use prosperity. Obviously, with 20 to 30% of Long and Forster customers going elsewhere, a lot of borrowers did go. Prosperity is licensed to do business as a lender in Maryland. Prosperity? Yes, and it's regulated as a lender. It is a lender. So borrowers would choose prosperity because they thought the service was good or they got a good price, and here the Petries did, in fact, get a good price. They had no complaint that they didn't allege they got their loan from somebody other than prosperity. They went to prosperity as a lender. Prosperity didn't hold itself out as a broker. They didn't dispute that they got the services that were required to make the loan. So this was a loan that was made and funded by prosperity, and the Finder's Fee Law is aimed at regulating brokers, not lenders, and not lender fees. I just find it so interesting that we can talk about prosperity as though it's somebody over in India doing these things when, in fact, it's an entity owned 50% by Wells Fargo and 50% by Long and Foster. Right. And it's nice to call it a separate entity with a separate identity that has almost like there's no conflict. What percentage do you send to Wells Fargo, 90%, and how much do you send? Well, you know what this is about. I mean, there's an arrangement here. I think you used the term one stop. Well, the model here is one-stop shopping. Yeah, which, I mean, if that saves money and that's the basis of it, then it all comes back to my question. Then it's a cost-benefit analysis. The bottom line is the borrower is just as good or better than he would be anywhere else. We don't worry about this little one-stop arrangement. Right. Prosperity added more competition to the marketplace. I mean, Wells Fargo loan officers competed with prosperity loan officers to get business. Prosperity competed with Bank of America and SunTrust and any other lender. We do need to recognize prosperity as an entity, not its ownership. I mean, we look at corporations all the time for its trends. They're distinct from their stockholders. If prosperity is a legitimate company that's licensed to do business and even competes, it seems to me we look at that company and not where they send their profits later. Yes, we absolutely agree. If they send profits at all, we don't even know that they're sending profits. Right, and that was not an issue that was litigated in the Petrie case. That was litigated in the Minter case. But, again, joint ventures are common in our society. And you can set up as many as you like. They can set up 100 of these things running around the country and never tell you they're connected to anything else. But, again, that's not an issue. I'd say it's a separate entity. Prosperity didn't hide that it was a joint venture. But the reality, because you're talking about actual fees, and you're saying these are the same things Wachovia would have charged. I said, wait a minute, Wachovia, but they will accept less because they are accepting less. Well, prosperity would also. Prosperity actually was more competitive in many instances. They wanted the business. They wanted to get these loans. They had to survive. They had to prove their existence and their worth. If they didn't get loans, then they wouldn't have no reason to exist. Money in volume? Is it because of the number of volume is the reason Wachovia would do this? Is it the number of loans? It's just more competition. It's just they're adding more competition in the marketplace. It's their business to be in the mortgage lending industry, and prosperity was another avenue to do that. All right. I think we've gone beyond the light. Thank you very much. Let's hear from Mr. Varen. Thank you, Your Honors. Good morning. I'm Jay Varen from Foley & Lardner. Speaking for all defendants, I represent Long & Foster and Walker Jackson. So I wanted to focus on the question that Judge Neumeier asked, the determinative question whether prosperity is a lender or a mortgage broker. And as Ms. Friedel said, it is a lender. The loan documents show it's a lender, but the point that I'd like to argue today is the collateral estoppel, judicial estoppel effect from the Minter case. Because all of Mr. Carney's arguments to you today, all the factual arguments that he gave to you today about how it's table funded, how there's simultaneous assignment, how this ownership structure is wrong. Did some of your witnesses testify that it was table funded? Excuse me? Didn't some of your witnesses say that? Well, one or two of our witnesses did say that it was table funded. That apparently wasn't true. It was not true. For instance, the President of Long & Foster, the owner of Long & Foster, who is a real estate guy and knows nothing about mortgage lending. He's kind of the boss of your guy. He's the owner. He's the head of that food chain by far over Prosperity. So he's the guy who tells him what to do. He has nothing to do with Prosperity, Your Honor. He owns Long & Foster. But the point is he knew nothing about mortgage lending. You say he has nothing to do with Prosperity? Yes, he has nothing to do with it. He's not involved in the operations. He doesn't understand mortgage lending. There was testimony at the trial that he delegated all responsibilities about Prosperity to people in his organization that knew. That has nothing to do with it, but that is the parent corporation. That corporation is directly in the line of- He owns Long & Foster. Long & Foster owns Prosperity. He doesn't know mortgage lending. The jury accepted his testimony, Your Honor. And that's my point. All of these allegations about Prosperity being a mortgage broker, about Prosperity not being a legitimate company, were on trial and mentor for 17 days. And the jury rejected all of these contentions. In particular, the allegation of mortgage broker came in relationship to this ownership structure, which is called under RESPA, an affiliated business arrangement. So this is what the jury-this is what the judge's instructions to the jury were about plaintiff's theory. But my questions have not gone in terms of the challenge the RESPA implications or even the whole business of the affiliated business arrangements. It's really going to the whole question of what are these fees and how do these fees-are they actual fees and are they the same? And, of course, you can look at the bottom line. You can crunch the data out there and look at the market and say, okay, they're doing just as good as the market is doing. And then there's the reality. The reality is corporation entity that's owned by the lender, in which the lender is sending the money there and 90% of it is coming right back to the lender through the secondary market. That's not how it works, Your Honor. Well, they did not give them a line of credit. Wells Fargo does lots of different things in the marketplace. No, I want to know that answer. They did not give this money to Prosperity? They're a warehouse lender. They provided warehouse loans to Prosperity. They get money from others, too. No, they had an exclusive warehouse line with Wells Fargo. That's permitted. There's nothing wrong with that. I understand that. They sold 10% of their loans. Every penny of their money comes from Wells Fargo and they turn around, they sell back 90% of it back to Wells Fargo. That's true. And in doing that, they do not give them the underwriting fees and all of that, the 490, because they've got their own little expenses. But the profit from it is shared with Long and Foster. The profit is shared with the partners. Your Honor, if- The partner is Long and Foster. But, Your Honor, Prosperity- Don't mince my words. I'm trying to make this simple. Okay. I understand we can say partner and all that stuff. We have two partners, Long and Foster and Wachovia, and the profit is shared with the two partners. That is correct. And my only- So the question then is this lender, which is Wachovia, even though you can say the money comes through and it goes back, only gets a percentage of what that fee is that the borrower is paying. So any opportunity the borrower has to directly negotiate with Wachovia is foregone. It's just not the case, Your Honor. Look, Prosperity competes with all kinds of different mortgage lenders. All those mortgage lenders' profits go to their shareholders. All those mortgage lenders have warehouse lines of credit just like Prosperity does. Who are the shareholders? They're different. Many of them are banks. Many of the mortgage companies are 100%-owned subsidiaries of banks. Some of the mortgage companies, like SunTrust, has a SunTrust mortgage company. The mortgage companies are separate entities. Some of the banks, obviously- You're talking about the shareholders of what company? Mortgage lenders. Mortgage lenders. PHH Mortgage is not a bank. It's a mortgage lender. It has shareholders. I'm accepting the legal proposition you're putting forth. I understand that. I'm talking about the reality here of what's going on here. Okay. Well, my point to you, though, Your Honor, is that the reality was litigated and mentor and found to be permissible. Not this issue. Yes, this issue. The RESPA issue that's dealing with it, but not the question of what is actual fees. That's true. And that's all I've been asking about. I understand the RESPA has- But, Your Honor, there is one very important point, if I could. As we started off, the Finder Fee Act only applies to mortgage brokers. If Prosperity isn't a mortgage broker, then the Finder Fee Act has absolutely no applicability. In Minter, the plaintiffs argued vociferously that Prosperity was a mortgage broker because it was indispensable to their two RESPA claims. So that's what I was going to read you, what the jury was told about one of the RESPA claims. Your argument, I gather, is that the allegation that Prosperity is a mortgage broker is common to both this case and Minter. Absolutely, Your Honor. And if it's a mortgage broker in this case, then the fees are going to be finder's fees. But if it's a lender in this case, then the fees charged, and they apparently are lending fees, lending types of fees. And your argument is that because the jury found that Prosperity was not a mortgage broker but a lender, that they're bound by that. That's absolutely correct, Your Honor. And the classes overlapped. They were not completely congruent by any means, but they overlapped. The same plaintiff's counsel represented both- If that were the case, if they overlapped, then your argument would be even stronger than race judicata. It would be law of the case. Well, they don't overlap completely, but 20,000 people in the Petrie class were also members of the Minter class. So we think that at least for the members that were in both classes, they are collaterally estopped by virtue of the finding in the Minter case. And is the finding you're talking about part of the special verdict? Yes, Your Honor. It's question three. The plaintiffs say that the Minter court never reached the question of whether Prosperity was a mortgage broker. But that's not true. In the closing argument, the plaintiff's counsel told the jury that the verdict, that the mortgage broker claim consisted of verdict questions three and four. The instructions were- They didn't take the counsel's argument in mind in the closing argument of that case. I'm sorry? Something else. They didn't pay much attention to the counsel's argument, apparently, in that case. Your Honor- I mean, that's true, isn't it? No, it's not true. Counsel, if we get into the Minter case, we're going to get into- I'm sure you are. I mean, if you go in there, it looks like they didn't really pay attention to what you were saying. Your Honor, the jury had 17 days of trial, five hours of closing argument. They might have forgotten what counsel said. You were relying on counsel's argument, and you're going there. And I said, wait a minute, let's not use counsel's argument. I'm not sure they listened. You might not have made any difference in the world. Let me just look at the verdict form. The jury instructions that the judge gave said that Prosperity and Wells were in an affiliated business arrangement, and they are claiming that a RESPA violation occurred in the Minter and Allboro transactions by Prosperity's referral of plaintiff's loans to Wells Fargo Bank as the actual lender, without disclosing to the plaintiffs its true relationship as a referring broker to Wells Fargo. And then they asked special verdict question three. Sorry, four. Did you prove by a preponderance of the evidence that Prosperity referred business to Wells Fargo? Answer, no, because there was indisputable evidence that Prosperity was the lender. The jury rejected all these arguments that the transaction was table funded. You said they did. I'm sorry? Not withstanding an argument. No, the other argument, Your Honor, was about the referral between Long and Foster and Prosperity. This argument is about whether Prosperity referred business to Wells Fargo as it would have had to if it was a broker. If Prosperity was the lender as it was, then it wouldn't have referred business to Wells Fargo because Wells Fargo supplying the funds in the secondary market isn't subject to RESPA. It's not a referral. And so the jury unequivocally rejected the proposition and all the arguments that Mr. Carney made that Prosperity was a mortgage broker. And so our point is that based on collateral estoppel, certainly with respect to all the common members of the class, but also with respect to the other putative members of the class, because they had the identical interest in proving that Prosperity was a mortgage broker. I think you're going through the red light here. Oh, I'm sorry, Your Honor. That's all right. There's a judicial estoppel component, too. I appreciate it. And I got a conditional. Judicial stop. Judicial stop. Got it. Mr. Carney. Thank you, Your Honors. I'd like to start with a response to one of Judge Conrad's questions, which was about the assignment of the loans, of Prosperity's loans, to anybody else, whether it be Wells Fargo or Ms. Freidel talked about U.S. Bank. All of those loans were initially assigned to Wells Fargo. And that's the testimony of Prosperity's own employee, that all of Prosperity's loans were initially assigned to Wells Fargo. Now, 10 percent of those loans, because of regulatory concerns, after regulatory concerns were raised, they picked a percentage amount for Wells Fargo to send to other lenders. And that was done by Wells Fargo's secondary market staff. So any assignment to any lender or any entity other than Wells Fargo took place at the behest of Wells Fargo and under its control. And what is the probative force of that fact with respect to the status as a broker? That demonstrates that Prosperity was cable funding these loans, that these loans were always under the control of Wells Fargo, that Wells Fargo controlled the funds. Wells Fargo controlled the funding process. And Wells Fargo had those loans, had ownership of those loans at the moment of funding. And that satisfies the definition of cable funding. And if they cable funded those loans, then Prosperity, as a matter of law, was the broker. And that's the issue that the district court said had to go to the jury. That's the question of fact. So there's a question of fact that the district court said had to go to the jury about whether or not Prosperity was a broker. So that's an issue that, again, they're disputing bits of evidence. The defendants have argued theirs. But this is something where there is conflicting evidence, and it should go to the jury. But there is ample evidence that Prosperity was the broker in these transactions. Where is the evidence of a finder's fee? The finder's fee is shown by the fact that Prosperity took fees that were not those actual costs that Your Honor referenced in Section 12804B. As the district court held in the class certification decision, and as every other court to have considered the issue has held, any fees that are not in those 12804B exclusions are finder's fees. And the Jones case, on which the district court relied, found that an origination fee was a finder's fee. And that's a fee for originating a loan. The Thrash-Webster case found that an origination fee, a processing fee, were finder's fees. Same fees at issue in this case. The Maryland Commissioner of Financial Regulation, the regulator of the Finder's Fee Act, issued an advisory which said in no uncertain terms that all fees collected by the broker are finder's fees. So all fees that are collected by the entity who's the broker, which is the jury question in this case, are the finder's fees. Your argument is that they're calling a dog a duck, but he's barking, not quacking. Well, my argument, Your Honor, is that the determination as to whether a finder's fee was collected depends on whether Prosperity was a broker. And that's the ultimate issue in this case. So the fact that they're calling themselves a lender, the facts, you believe, indicate that they were functioning as a broker. They were functioning as both a broker and a lender, yes, Your Honor. And that is an arrangement that the Maryland legislature expressly prohibited. And that's the purpose of the Finder's Fee Act was to stop this marriage between brokering and lending. What was the argument about the decision in Minter having an adverse effect on you? In other words, there the jury found that Prosperity was not a broker but a lender. Well, in fact, Your Honor, the jury did not find that. I understand, but we'll get to that. But accept that as a hypothetical for this purpose, that the jury found that Prosperity was a lender, not a broker. Well, assuming that that was the case. That's what I'm asking you to do. The defendants carved all of the Petries and 75% of the Petrie class out of the Minter case. That was decertified. It was not at issue in Minter. And, in fact, the defendants insisted and the district court ordered. Was there overlap? There is an overlap of about 25% of the class members, not including the named plaintiffs. How much effect does that have? Well, you know, that's an issue. There is no effect because the jury didn't reach the broker question. I'm asking you to assume that the jury found that Prosperity was not a broker. My question is, what effect does that have on this case? Well, again, Your Honor, the jury just simply didn't find it. If the jury had found that Prosperity was not a broker. Can you assume a question the way I've posited? If the jury had found that Prosperity was not a broker, then that would have an impact on 25% of the class, which may be something. What should we do with that if we were to conclude that? Well, then that should be something that should be brought to the district court's attention. And the district court always has the authority, the discretion to modify the class certification. But I'm not suggesting the scope of the class. I'm talking about the legal finding, the effect of the legal finding. Well, it's a pretty persuasive finding. That implicates both cases. Because in one case, the jury made findings of fact after a long trial. And you presented the same evidence with respect to the role of Prosperity in these cases. And the jury made a finding. Now, we'll talk about that in a mentor case. But when you read the jury's questions in connection with the judge's instructions for answering those questions, it seems to me a claim, a legitimate claim, could be made that the jury found that Prosperity was not a broker. Well, Your Honor, there was… You can argue that, and I'm going to reserve that. But I have to have the hypothetical now. And it seems to me when the jury has made that factual finding, I don't… Go ahead. Your Honor, if the jury had made that factual finding that precluded the 25% of the Petrie class members from litigating that issue, again, the defendants insisted and the district court ordered that a notice be sent to 75% of the Petrie class, including the named plaintiffs, saying the mentor verdict does not apply to you. The defendants insisted on that. That notice was sent out to 75% of the Petrie class members. The mentor verdict does not apply to you. Those are non-overlapping. That doesn't advance… That doesn't address the problem that we're facing is where we have overlap. And I'm trying to find out where you have overlap in the classes. What is the legal effect of such a finding? Not on the scope of the class. You've defined the scope, and you agree that 25% are parties to both cases. Yes, Your Honor. Okay, now, if they're parties to both cases, are those 25% bound by the jury finding in this case? Assuming that the mentor jury had found that under the finder fee… My question is, is the 25% in this case bound by what the jury found in mentor? The 25% is bound… The 25% of the Petrie class that is in the mentor class is bound by the mentor verdict. Yes, Your Honor. That's what I thought, okay. Okay, thank you. And one other point, the issue about the distinction… Well, you have gone through red light, so you take a minute. Okay, the issue about the distinctions between Wells Fargo and Long and Foster and Prosperity under the Finders Fee Act all must be seen as the same. The Finders Fee Act defines a person as including two or more persons with a joint or common interest, and here that is indisputably all of the defendants. They're all the same. This is exactly the kind of arrangement that the Finders Fee Act was designed to prevent, and the legislative history of the Act shows that, that marrying mortgage brokering and mortgage lending together was what the Act was intended to prevent. And so we respectfully ask that the Court certify the questions to the Maryland Court of Appeals about the definition of Finders Fee and reverse the district court. Thank you, Your Honor. Matt. Do I understand we have some sort of rebuttal here of some kind or rebuttal on the cross? Yes, Your Honor. I have one minute, I believe, and the point would be to just talk quickly about the conditional cross appeal that we made. We sincerely hope that Your Honors don't remand the case, but that if you did, there were issues in class certification that we wanted to bring to the Court's attention and have done in the briefs. We don't think that the class should be taken as is. If remanded, there were problems. It was decided pre-Walmart. The judge made the determinations based on allegations, not on what the claims and evidence would show. He lumped timely claims in with untimely claims, and as this Court said in Doe, that undermines typicality. We think he misconstrued the statute of limitations as well. So if there is any kind of remand, we would ask that either the Court decertify the class or at least indicate that it should be looked at anew. If I could just respond real quickly on this collateral estoppel thing for a second, because the 25% I think is clearly bored, but I think the 75% are bored as well, because not only was the interest the same and the representation adequate, but there were judicial estoppel statements that come in here in addition, where if you look at what the plaintiffs wrote in their class briefs and what the judge wrote in the order, they represented that all the loans were the same in both Minter and Petrie. In short, either Prosperity-Wells Fargo relationship and their funding method makes Prosperity a mortgage broker or it doesn't. The answer to the question will apply to all putative class members. Every single loan made by Prosperity to plaintiff Denise Minter, Allboro, and Bradley and Stacey Petrie were funded by the same warehouse line of credit. Every class member's loan was identical. Where are those statements? These statements, the last one I – No, both of them. Okay. They came from different items? Yeah, from different items. Some of the statements about the result being the same for all class members, i.e., the 25% and the 75%, were made in the Petrie docket number 164 at page 16 and also at page 12. The statements about the loans in the Petrie case and the Minter case being identical are also made in that same reply brief at page 2. And then in the main plaintiff class cert brief, 124 at pages 46 and 47 of the brief, basically they say that commonality is established because of the uniform manner in which defendants treated putative class members in both cases, i.e., the mortgage loans made to class members in both Minter and Petrie were originated, processed, underwritten, funded, and assigned in the same manner. The loans made to plaintiffs Denise Minter, Jason and Rachel Allboro, and Bradley and Stacey Petrie followed this same fact pattern. Thank you, Your Honors. We'll come down at Greek Council and take a short recess. Senate Book Court will take a brief recess.
judges: Paul V. Niemeyer, James A. Wynn, Jr., Robert J. Conrad, Jr.